UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IHSAN MALKAWI, on Behalf of Herself and
Others Similarly Situated,

                    Plaintiff,

      -against-

CITY OF YONKERS,

                    Defendant.

No. _____

**CLASS ACTION
COMPLAINT AND
JURY DEMAND**

Plaintiff Ihsan Malkawi, on behalf of herself and others similarly situated (collectively, the "Class"), by and through her attorneys, Emery Celli Brinckerhoff & Abady LLP and the Council on American-Islamic Relations, New York Inc., for her Complaint alleges as follows:

### PRELIMINARY STATEMENT

1.      Yonkers Police Department ("YPD") officers instructed Ihsan Malkawi, a practicing Muslim-American woman, to remove her hijab so they could photograph her.

2.      Ms. Malkawi pleaded with them not to remove it. She explained that her hijab—a headscarf she wears daily to cover her hair and signify modesty and devotion to the Muslim faith—is not a fashion accessory, but an essential component of her religion.

3.      The officers did not listen. They told Ms. Malkawi—falsely—that the law required her to remove her hijab.

4.      Distraught by this coerced violation of her religious practice, yet fearful of the legal repercussions if she did not comply, Ms. Malkawi wept while she did as she was told.

5.      Eight hours earlier, Ms. Malkawi had thought August 26, 2019 would be a typical day.  She woke up, ate breakfast, and went—along with her husband, Nader Malkawi—to register their two children for school.  She expected to then go to her job as a Coordinating Manager at Bellevue Hospital.

6.      Ms. Malkawi never made it to work.  Instead, she was arrested based on the overzealous policing of the YPD aggressively interrogated, handcuffed for the first time in her life, and forced to remove her hijab for nearly thirty-six hours while in the YPD's custody.

7.      After YPD officers coerced her to remove her hijab for the official mug shot ("Booking Photograph"), Ms. Malkawi endured a full day and night without her hijab.  YPD officers then photographed her uncovered for a second time.  They paraded her, bare-headed, past numerous male YPD officers.  They detained her in a holding cell visible to male inmates.  And they brought her to a public courtroom filled with strangers for her arraignment.

8.      Like many Muslim women whose religious beliefs dictate that they wear a hijab, Ms. Malkawi felt exposed and violated without hers—as if she were naked in a public space.

9.      Ms. Malkawi endured this trauma because of a YPD policy that forces arrestees to remove their religious head coverings without their consent while in custody— sometimes for a Booking Photograph that is kept forever, visible to all who can access the YPD's main database or have occasion to view an arrestee's paper file, and sometimes for no reason at all.

10.     Contrary to what the YPD told Ms. Malkawi, the law *prohibits* Defendant from forcing Ms. Malkawi to remove her hijab in public against her will.

11. The YPD's unnecessary and discriminatory policy (the "Removal Policy") is out of step with national norms, federal law, and the United States and New York State Constitutions. The substantial burden the Removal Policy places on religious practice is directly prohibited by the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"). "A Muslim woman who must appear before strange men she doesn't know, with her hair and neck uncovered in a violation of her religious beliefs, may feel shame and distress. This is precisely the kind of 'mischief' RLUIPA was intended to remedy." *Khatib v. County of Orange*, 639 F.3d 898, 907 (9th Cir. 2011) (Gould, J., concurring). The Removal Policy also contravenes the First Amendment to the United States Constitution; Article 1, Section 3 of the New York State Constitution; and New York State law.

12. This civil rights class action seeks damages and declaratory and injunctive relief to (a) compensate Class members for the severe emotional damages they have suffered; and (b) enjoin the City of Yonkers from continuing to implement its police policy requiring arrestees to remove their religious headgear while they are in custody.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the New York State law claim pursuant to 28 U.S.C. § 1367.

14. The instant action arises under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, and the First and Fourteenth Amendments to the United States Constitution.

15. The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the

events and/or omissions giving rise to the claims occurred in the District.

## PARTIES

16.    Plaintiff Ihsan Malkawi currently resides in Yonkers, New York.

17.    Defendant City of Yonkers (the "City") is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain the YPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The YPD is a duly authorized public authority able to perform all functions of a police department under the applicable sections of the New York State Criminal Procedure Law.  Defendant City assumes the risks incidental to the maintenance of the YPD's police force and the employment of police officers.

## JURY DEMAND

18.    Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

19.    This case is about a YPD policy—the Removal Policy—that violates the First Amendment as well as other federal and state laws.  Pursuant to the Removal Policy, YPD officers force arrestees who wear religious head coverings to remove those head coverings while in custody—including for a Booking Photograph that is maintained indefinitely—even where doing so violates the arrestees' sincerely-held religious beliefs.  This practice alienates and oppresses faith communities throughout Yonkers.  The Removal Policy lacks justification and must be changed.

### The Hijab

20.    Ms. Malkawi wears a hijab pursuant to her Muslim faith.  For the purpose of discussing the Removal Policy, the term "hijab" is used throughout this Complaint to refer to

a garment worn by many Muslim women in various parts of the world; it is a headscarf that covers the wearer's hair, ears, and neck, and frequently part of her chest, but leaves her entire face exposed.  In Arabic, the word "hijab" derives from the word "*hajaba*," sometimes translated as to hide or screen from view or to cover.  Wearing a hijab is also known as "covering."  Ms. Malkawi does not wear a niqab, or a face veil.

21.    For many observant Muslim women, including Ms. Malkawi, the practice of covering entails wearing one's hijab at all times, whether at home or in public, when the wearer is in the presence of men who are not part of her immediate family ("*mahram*").

22.    While women choose to wear the hijab for an array of reasons, many believe that the hijab fulfills the commandments of modesty and devotion that stem from, among other things, the *Qur'an*, the primary holy book of the Muslim faith, and the *hadith*, oral traditions carried down from the age of the Prophet Mohammed (S.A.W.).[1]  Ms. Malkawi and other women who cover frequently view wearing the hijab as a mandatory aspect of Muslim identity and faith.

23.    Ms. Malkawi wears a hijab because her faith dictates that no man outside of a woman's *mahram* should see her uncovered hair, head, or neck.  She wears a hijab every single day and believes that her religious faith requires her to do so.  Ms. Malkawi has covered daily since she was a teenager, when she first began to wear the hijab pursuant to Muslim tradition.  The hijab is core to Ms. Malkawi's identity.  It is an essential part of who she is.

24.    Being forced to remove one's hijab in public, particularly in the presence of men who do not belong to the wearer's *mahram*, is a profound defilement of the wearer's

_____

[1]    The phrase "S.A.W." is shorthand for "*ṣallā Allāhu ʿalayhi wa salam*," a phrase that translates to "God's blessings and peace be upon him" and that is frequently used to express love and respect for the Prophet.

sincerely-held religious beliefs and a violation of her religious practice.  Requiring a Muslim woman to remove her hijab in public is akin to demanding that a secular person strip naked in front of strangers.

***Ihsan and Nader Malkawi Are Arrested Based on False Allegations of Abuse***

25.     The events that led Ms. Malkawi into the custody of the YPD began the day before, on August 25, 2019.  That day, Ms. Malkawi's daughter tried to run away.  Ihsan and her husband, Nader, found their daughter early the same evening and brought her home.  The Malkawis then argued about their daughter's desire to return to Michigan, where the family previously lived.  Ihsan and Nader went to sleep, planning to continue talking with their daughter once she had calmed down.

26.     But the next day, the Malkawis' daughter called 911 unbeknownst to her parents, falsely alleging that Ihsan and Nader had assaulted her with a belt and a curtain rod the previous night.

27.     At approximately noon on August 26, 2019, Ms. Malkawi's neighbor called her, explaining that YPD officers had appeared in front of the Malkawis' house.  Ihsan and Nader, who had been registering their children for school with the Yonkers Board of Education, rushed home.

28.     When the Malkawis arrived at home, three YPD officers were waiting. The officers instructed Ihsan and Nader to come to the nearest precinct—YPD Headquarters— for questioning.  The Malkawis agreed and drove to the precinct, where they were met by more YPD officers and by Richard Bradley, an investigator from New York Child Protective Services.

29.     The YPD officers questioned Ihsan and Nader separately.

30.     When Mr. Bradley spoke with Ms. Malkawi, he told her he did not know

why the YPD was reacting to her daughter's allegations with such a heightened level of formality, because he did not find the allegations credible. He suggested that the YPD was taking aggressive steps because Ms. Malkawi wears a hijab.

***Ihsan Malkawi Is Forced to Remove Her Hijab at YPD Headquarters and at the City Jail***

31.    After Ms. Malkawi met with Child Protective Services, YPD officers arrested and handcuffed her, then took her to a holding cell. A female YPD officer escorted Ms. Malkawi from her cell and ordered Ms. Malkawi to remove her hijab for a Booking Photograph, saying, "you can't take a photo or go into a cell with this."

32.    Ms. Malkawi, who had never before been asked to remove her hijab in public, told the officer that she could not remove the hijab. She explained to the officer that her hijab was not a fashion accessory, that she wore it because of her religious faith, and that it was not appropriate for her to remove it for the photograph. The female YPD officer consulted a male supervisor, who refused to allow Ms. Malkawi to retain her hijab for the Booking Photograph. The officers told Ms. Malkawi: "It's the law."

33.    Agitated, distraught, and fearful of further criminal charges, Ms. Malkawi reluctantly removed her hijab to be photographed. Ms. Malkawi was devastated and in tears. Two female officers then took Ms. Malkawi's photograph while she was uncovered.

34.    But the YPD did not stop there. The female YPD officer told Ms. Malkawi that she could not return to the cell wearing her hijab. The officer then confiscated the hijab and did not provide Ms. Malkawi with a replacement. The officer forced Ms. Malkawi to walk, handcuffed, back to the holding cell directly past at least six male officers. With her head and hair exposed against her will, Ms. Malkawi felt terrified, helpless, and violated.

35.    Ms. Malkawi spent Monday night in a holding cell without her hijab,

visible to numerous strangers—many of them men—walking by.

36.     The next afternoon, Ms. Malkawi was taken—still uncovered—to Yonkers City Court for arraignment.  Again, she was publicly exposed to at least a dozen men.  Again, she felt ashamed and naked without her hijab.

37.     YPD officers then took Ms. Malkawi to the City Jail for processing, where a male officer photographed Ms. Malkawi for a second time without her hijab.  Ms. Malkawi was left in a City Jail holding cell for nearly twelve hours—still without her hijab—and forced to wear a short-sleeved shirt instead of the long-sleeved shirt her faith demanded.

38.     Ms. Malkawi's husband bailed her out at approximately 1:00 a.m. on Wednesday, August 28, 2019.  The YPD did not give Ms. Malkawi her hijab back until she was in the parking lot outside of the City Jail.  She had been without it for nearly thirty-six hours.

39.     Later, after a full investigation, Child Protective Services and the Office of Children and Family Services deemed the allegations of physical abuse against Ihsan and Nader unfounded.[2]

40.     Upon information and belief, the YPD still maintains at least two photographs of Ms. Malkawi without her hijab.  The existence of these photographs haunts Ms. Malkawi, who is distressed by the prospect of the photographs being viewed again and again by men who are not members of her immediate family.  The continued availability of the uncovered photographs is an ongoing harm to Ms. Malkawi because it prolongs and intensifies the YPD's initial assault on her religious rights.

41.     Because of the extended, coerced removal of her hijab while in YPD custody, Ms. Malkawi still experiences anxiety about wearing her hijab in public.  Before the

---

[2]     Mr. and Ms. Malkawi both pleaded guilty to a reduced charge of disorderly conduct.

incident, Ms. Malkawi trusted police officers; now, she is wary and skeptical of all law enforcement, fearing that she will again be arrested and forced to strip away an essential part of her faith.

### YPD's Removal Policy Forces People in Custody to Remove Religious Head Coverings Against Their Will

42.    On information and belief, the YPD maintains and implements a policy and/or practice that requires people in its custody to remove their religious head coverings against their will.

43.    Upon information and belief, the Removal Policy is applied—as it was to Ms. Malkawi—to require that arrestees remove their head coverings for Booking Photographs, in front of at least one person outside the arrestee's immediate family.  The resulting "uncovered" photograph is then integrated into  law enforcement databases and remains visible to any YPD employee who has access to the arrest database or to an arrestee's paper file.[3]  This practice increases the likelihood that images of arrestees without their religious head coverings will be viewed by many people long after the Booking Photograph is taken.

44.    Upon information and belief, the Removal Policy is also applied—as it was to Ms. Malkawi—to require that arrestees turn their head coverings over to YPD officers while they remain in custody.  No replacement head covering is provided.  This requirement means that an arrestee may be seen uncovered by other arrestees in YPD custody.  She or he may be seen uncovered by people in courthouses or courtrooms during an arraignment or other court appearances.  And she or he may be seen uncovered by any number of YPD employees.

_____

[3] *See* http://www.nydailynews.com/new-york/nyc-crime/YPD-ripped-abusing-facial-recognition-tool-article-1.3847796 (last accessed March 4, 2018).

***Federal, State, and Local Governments Across the United States Permit Religious Head
Coverings to Be Worn in Official Photographs and While in Police Custody***

45.     The YPD's Removal Policy contravenes national norms and practices.
From the federal to the local level, government and law enforcement entities recognize the
significant constitutional and statutory interests at play and permit those in custody to wear
religious head coverings, including for the purpose of official photographs.

46.     The United States Department of State permits those who wear hats or
head coverings for religious reasons to keep those coverings on in official passport photographs.
The Department of State website allows those being photographed to wear a religious hat or head
covering if they "submit a signed statement that verifies that the hat or head covering in [the
person's] photo is part of traditional religious attire worn continuously in public."[4]

47.     Similarly, the United States Citizenship and Immigration Services
("USCIS") issued a policy memorandum on July 23, 2012 that permits religious head coverings
to be worn in photographs.  The memorandum states that "USCIS will accommodate an
individual who wears headwear as part of their religious practices."[5]  Should a head covering
cast a shadow over the wearer's face or otherwise obscure part of their face, USCIS will "ask an
individual to remove or adjust portions of religious headwear that covers all or part of the
individual's face."  In this situation, USCIS will offer the wearer a private room or screened area
in which to adjust their head covering as well as a photographer of their gender.  The religious
head covering in question "is allowed to cover the ears if USCIS can still identify the

_____

[4] *Available at* https://travel.state.gov/content/travel/en/passports/how-apply/photos.html (last accessed February 6,
2020).

[5] *Available at*
https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2012/August%202012/Accommodating%20Reli
gious%20Beliefs%20PM.pdf (last accessed February 6, 2020).

individual."

48.     The New York State Department of Motor Vehicles Regulations of the Commissioner, 15 CRR-NY 3.8, entitled "Photographic driver licenses," also permit an applicant for a driver's license to keep her hijab on while having her official driver's license photograph taken.  In July 2007, officials at the Department of Motor Vehicles sent letters of reminder to offices throughout New York State regarding head coverings and their approved use in driver's license photographs.

49.     Law enforcement officials across the country have likewise recognized the right of citizens to wear hijabs or other religious head coverings while in police custody.

50.     In Long Beach, California, the City Council approved a July 2017 settlement between a woman required to remove her hijab for a post-arrest photograph and the Long Beach Police Department that amended the Department's official policy so as to accommodate persons who wear religious head coverings.  The Department is no longer permitted to forcibly remove the hijabs of female arrestees at any point while they are in custody.

51.     In amending its policy, Long Beach joined two neighboring jurisdictions, San Bernardino County and Orange County, which adopted policies protecting detainees who wear religious head coverings following lawsuits that settled in 2008 and 2013 respectively.

52.     In Hennepin County, Minnesota—the county that includes Minneapolis—the Sheriff's Office implemented a new policy in March 2014 for inmates at the Hennepin County Jail and those in custody throughout Hennepin County.  The policy permits female arrestees to keep their hijabs on while a Booking Photograph is taken and provides that the hijab can be pushed back slightly off of the wearer's face if necessary.  Inmates at the County Jail are permitted to wear hijabs while incarcerated.

11

53.     In Dearborn Heights, Michigan, the Police Department changed its booking procedures in July 2015 after a woman was forced to remove her hijab in the presence of men during the booking photograph and while in custody.  The Police Department implemented reform after that woman filed suit alleging violations of her religious rights. According to the updated policy, Muslim women are not required to remove religious head coverings like hijabs for any booking photograph and are permitted to wear head coverings while in custody.

54.     In Portland, Maine, Cumberland County Sheriff Kevin Joyce publicly apologized after releasing the booking photographs of two Muslim women who had been arrested at a Black Lives Matter protest.  The photographs showed each woman without her hijab; Joyce offered his "sincerest apologies . . . to the Muslim community for the appearance that we are disrespecting their religious beliefs and practices."[6]  The Cumberland County Jail procedures require a woman to remove her hijab only in private, without men present, and provide that two booking photographs will be taken, one with the woman's hijab and another without.

55.     Each of these examples reflects a growing national consensus that there is no basis to require the removal of religious head coverings of arrestees while they are in police custody.

***The YPD's Unlawful Removal Policy Forces People in Custody to Violate Their Religious Beliefs***

56.     Federal legislation has been enacted to demonstrate our robust national commitment to the free exercise of religion and to prohibit the government from placing a

---

[6] *Available at*  https://www.pressherald.com/2016/09/14/sheriffs-office-apologizes-for-improperly-releasing-photos-of-muslim-protesters/ (last accessed March 4, 2018).

substantial burden on religious beliefs.  This legislation, which reflects an increased awareness of and support for religious interests in practices like covering, "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by . . . the Constitution." 42 U.S.C. § 2000cc-3(g).  The statute even "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c).

57.    In contravention of this legislation and the tolerant, inclusive policies it embodies, the YPD's Removal Policy has had a corrosive effect on Muslim-American women in Yonkers—and, upon information and belief, on other Yonkers residents who wear religious head coverings and are arrested by the YPD.

58.    Moreover, the Removal Policy is a profound manifestation of insensitivity towards religious practices and interests.  In today's post-9/11 climate, Yonkers—like much of New York state—is beset with widespread hostility towards and baseless fear of Muslim-Americans.  In the context of this increasingly polarized setting, it is incumbent on the City's law enforcement to increase awareness of and sensitivity towards the Muslim-American community by setting an example in itsarrest and booking practices.  The Removal Policy has precisely the opposite effect.

***Notice of Claim***

59.    Ms. Malkawi filed a timely notice of claim that was served upon Defendant.

60.    The City of Yonkers held a hearing on Ms. Malkawi's notice pursuant to General Municipal Law § 50-h on March 6, 2020.

13

## CLASS ACTION ALLEGATIONS

61.    Ms. Malkawi brings this suit as a class action under Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(3), on behalf of herself and other individuals similarly situated who were forced to remove their religious head coverings while in custody pursuant to the Removal Policy or any other written or unwritten policy of the YPD.

62.    All of the members of the Class were injured as a result of Defendant's conduct.

63.    The members of the Class are so numerous that joinder of all Class members is impracticable.  On information and belief, approximately 3,000 adults were arrested in Yonkers between October 2018 and September 2019, a number that increased from the prior year.[7]  Upon information and belief, thousands of residents of Yonkers are Muslim women who wear the hijab, and tens of thousands of residents of Yonkers wear other religious head coverings, including headscarves, hats, wigs, turbans, kufis, yarmulke or other head and/or hair coverings in accordance with their religious beliefs.

64.    The questions of law and fact presented by Ms. Malkawi are common to other members of the Class.  Among others, the questions of law and fact common to the Class are:

> a.    Whether the YPD's Removal Policy, either on its face or as applied, violates the RLUIPA by imposing a substantial burden on the religious exercise of Class members;
>
> b.    Whether the Removal Policy is in furtherance of a compelling governmental interest and is the least restrictive means of furthering

---

[7] *See* https://www.criminaljustice.ny.gov/crimnet/ojsa/greenbook.pdf (last accessed February 11, 2020).

that interest;

c. Whether the Removal Policy, either on its face or as applied, deprives Class members of their right to freely exercise their religion pursuant to the First Amendment to the Constitution of the United States and/or Article I, Section 3 of the Constitution of the State of New York; and

d. Whether Class members are entitled to relief and, if so, the nature and extent of that relief, including without limitation the amount of monetary damages.

65. Common issues of law and fact, including without limitation those set forth above, predominate over any individual issues.

66. The claims and practices alleged herein are common to all members of the Class.

67. The violations suffered by Ms. Malkawi are typical of those suffered by the Class, as all members of the Class were subjected to the forced removal of religious head coverings in a Yonkers facility after being arrested or entering police custody.  The entire Class will benefit from the monetary relief sought.

68. Ms. Malkawi has no conflict of interest with any Class members, is committed to the vigorous prosecution of all claims on behalf of the Class, and will fairly and adequately protect the interests of the Class.

69. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant.

70.     Counsel competent and experienced in federal class action and federal civil rights litigation has been retained to represent the Class.  Emery Celli Brinckerhoff & Abady LLP is a law firm with offices in New York City with extensive experience in complex civil rights litigation and class action lawsuits.  Council on American-Islamic Relations New York is a non-profit organization based in Queens, New York with substantial experience in civil rights litigation and knowledge of New York religious communities.

71.     This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable.  The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation; therefore, it is highly impractical for such Class members to seek individual redress for damages.

72.     There will be no extraordinary difficulty in the management of this Class action.

### FIRST CAUSE OF ACTION
### The Religious Land Use and Institutionalized Persons Act
### (42 U.S.C. § 2000cc)

73.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

74.     The RLUIPA provides, in relevant part, the following: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person- (1) is in furtherance of a compelling governmental interest; and (2) is the least

restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a)(1)-(2).

75.    Plaintiff and Class members are "persons" as defined under the RLUIPA. *See* 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997(3).

76.    Plaintiff's and Class members' decisions to wear religious head coverings constitute sincerely-held religious beliefs.

77.    At all relevant times, Defendant met the definition of the term "government" under the RLUIPA.  *See* 42 U.S.C. § 2000cc-5(4)(A)(i)-(iii).

78.    At all relevant times, the locations where the YPD detains and photographs arrestees (including, but not limited to, YPD Headquarters at 104 South Broadway, Yonkers, NY, and the City Jail at Yonkers City Court, 100 South Broadway, Yonkers, NY, where the events alleged above transpired) are federally-funded "institutions" as defined under the RLUIPA and the Civil Rights of Institutionalized Persons Act of 1980 ("CRIPA"), 42 U.S.C. § 1997(1)(B)(ii)-(iii).

79.    At all relevant times, Plaintiff and Class members were "residing in or confined to institutions" as defined under the RLUIPA when the events alleged above transpired.

80.    Defendant's acts or omissions, policies, and customs substantially burdened Plaintiff's and Class members' religious exercise by requiring them to remove their religious head coverings while they were residing in or confined to locations where the YPD detains and photographs arrestees.

81.    Defendant's acts or omissions, policies, and customs do not further a compelling government interest.

82.     Defendant's acts or omissions, policies, and customs are not the least-restrictive means of furthering a compelling government interest.

83.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff and the Class have sustained damages, and have suffered and continue to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

**SECOND CAUSE OF ACTION**
**Free Exercise Clause**
**(42 U.S.C. § 1983)**

84.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

85.     42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the Constitution.

86.     At all relevant times, Defendant acted under color of state law.

87.     Under the First Amendment to the Constitution of the United States of America, Plaintiff and the Class have the right to freely exercise their religion.

88.     By forcing Plaintiff and the Class to remove their religious head coverings for post-arrest photographs, transport, and confinement, Defendant deprived Plaintiff and the Class of their right to freely exercise their religion in contravention of the Free Exercise Clause.

89.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff and the Class have sustained damages, and have suffered and continue to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

**THIRD CAUSE OF ACTION**
**New York State Constitution, Article I, Section 3**

90.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

91.     Article I, Section 3 of the Constitution of the State of New York provides that: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind." McKinney's Const. Art. 1, § 3.

92.     Defendant's policy requiring that arrestees who wear religious head coverings remove those head coverings for post-arrest photographs, transport, and confinement violates Article I, Section 3 by disallowing the free exercise of religion.

93.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff and the Class have sustained damages, and have suffered and continue to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

**FOURTH CAUSE OF ACTION**
**Declaratory Judgment**
**(Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201-02)**

94.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

95.     Defendant's conduct was intentional and made with reckless indifference to Plaintiff's and Class members' religious rights.

96.     Plaintiff's and Class members' rights to freely exercise their religion was infringed upon and substantially burdened by Defendant's conduct.

97.     Defendant's policy and custom of forcing the removal of religious head coverings for post-arrest photographs, transport, and confinement, including the hijab worn by Ms. Malkawi, is an unlawful and unconstitutional practice that infringes upon Plaintiff's and Class members' rights to freely exercise their religion without the interference of substantially burdensome government conduct.

98.     Defendant's policy, practice, and custom caused and continues to harm Plaintiff and Class members.

99.     Plaintiff and the Class are entitled to a declaratory judgment that Defendant infringed upon and substantially burdened their religious free exercise and continues to substantially burden their religious free exercise in violation of federal and state law and the United States Constitution.

100.    Plaintiff and the Class have a strong likelihood of succeeding on the merits of their claims.

WHEREFORE, Ms. Malkawi, on behalf of herself and the Class, respectfully requests an order certifying this suit as a class action pursuant to Federal Rule of Civil Procedure 23, and request judgment against Defendant as follows:

a) Declaring that Defendant's discriminatory practices violate the RLUIPA, 42 U.S.C. § 2000cc *et seq*.; the Free Exercise Clause of the First Amendment to the United States Constitution; and Article 1, Section 3 of the New York State Constitution;

b) Enjoining Defendant, Defendant's agents, employees, and successors, and all other persons in active concert or participation with Defendant from requiring the removal of any religious head or hair coverings while an arrestee or detainee is in the YPD's custody;

c) Requiring Defendant to adopt nondiscriminatory policies and practices to prevent encroachment on the religious rights of arrestees and detainees in the future;

d) Awarding Plaintiff and the Class such damages as will fully compensate them for their loss of rights and emotional distress suffered due to Defendant's unlawful conduct;

e) Awarding Plaintiff and the Class punitive damages;

f) Awarding Plaintiff and the Class attorneys' fees, costs, and expenses incurred in prosecuting this action; and

g) Granting Plaintiff and the Class such other further relief as may be just and proper.

Dated: New York, New York
April 8, 2020

EMERY CELLI BRINCKERHOFF &
ABADY LLP

By: _____

O. Andrew F. Wilson
Emma L. Freeman
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS NEW YORK, INC.

Ahmed M. Mohamed*
46-01 Twentieth Avenue
Queens, New York 11105
(646) 665-7599

*Admission forthcoming

Attorneys for Plaintiff and the Class

21